Robert T. HULMES, Plaintiff,

v.

HONDA MOTOR COMPANY, LTD., Honda Research and Development Group, Ltd., Honda R & D North America, Inc., and American Honda Motor Company, Inc., Defendants.

and

HONDA MOTOR COMPANY, LTD., et al., Third Party Plaintiffs,

v.

Nicholas J. HULMES, Third Party Defendant.

Sherry HERTLEIN, Plaintiff,

v.

HONDA MOTOR COMPANY, LTD., et al., Defendants.

and

HONDA MOTOR COMPANY, LTD., et al., Third Party Plaintiffs,

v.

Nicholas J. HULMES, Third Party Defendant.

Civil Action No. 93–2771.

United States District Court, D. New Jersey.

March 11, 1997.

As Amended March 17, 1997.

846

Lewis M. Levin, Joseph Viola, Lewis M. Levin & Associates, Philadelphia, PA, for Plaintiff, Robert T. Hulmes.

David Bross, Cherry Hill, NJ, for Plaintiff, Sherry Hertlein.

Robert St.L. Goggin, Brian C. Dareff, Marshall, Dennehy, Warner, Coleman & Goggin, Marlton, NJ, Paul G. Cereghini, Bowman & Brooke, Phoenix, AZ, for Defendants, Honda Motor Company, Ltd., Honda Research and Development Group, Ltd., Honda R & D North America, Inc., and American Honda Motor Company, Inc.

## OPINION

ORLOFSKY, District Judge.

This product liability lawsuit against defendants, Honda Motor Company, Ltd., Honda Research and Development Group, Ltd., Honda R & D North America, Inc., and American Honda Motor Company, Inc. (collectively referred to as "Honda") was tried before this court and a jury from September 24, 1996, through October 31, 1996. The jury returned a special verdict in which it found no design defect in the subject All Terrain Vehicle ("ATV"). However, the jury found the ATV defective by reason of a failure to warn. In response to special interrogatories requesting an allocation of comparative fault, the jury found the plaintiff, Robert Hulmes ("Hulmes" or the "plaintiff"), sixty-six (66) percent at fault for his injuries. On October 31, 1996, the court entered judgment in favor of defendants on all counts pursuant to N.J. Stat. Ann. §§ 2A:15–5.1 and 15–5.2. Judgment was also entered against Sherry Hertlein, Hulmes's former spouse, on her derivative *per quod* action.

Plaintiff now moves to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e), or, alternatively, for a new trial pursuant to Fed.R.Civ.P. 59(a).[1] Plaintiff's motions require this court to revisit and plumb once again the murky depths of New Jersey's Product Liability Law. For the reasons set forth below, plaintiff's motions will be denied.

## I. Standards Governing Rule 59 Motions

The decision whether to grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) lies within the district court's sound discretion. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980); *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir.1995). Errors in judicial

---

1. Rule 59 provides, in pertinent part:
 (a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried with-

out a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.
 . . . .
 (e) Motion to Alter or Amend Judgment. Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.
Fed.R.Civ.P. 59.

rulings or in the conduct of the court warrant a new trial where the error or conduct was prejudicial. 6A James Wm. Moore, *Moore's Federal Practice* § 59.08(2) (2d ed.1996). However, even if the court determines that an error was made, it should not grant a new trial unless it also determines that the error was so prejudicial that "refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. *See also Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D.Pa.1989), *aff'd*, 922 F.2d 184 (3d Cir.1990).

█ Under Federal Rule of Civil Procedure 59(e), a district court may alter or amend a judgment: (1) when there has been an intervening change in the law; (2) when new evidence becomes available only after trial; (3) if the court has committed clear legal error; or (4) if the judgment without amendment would create a manifest injustice. *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995). Hulmes offers no new evidence, nor does he claim that there has been a change in the controlling law. Rather, plaintiff contends that this court has committed clear legal error.

█ Courts should not lightly disturb jury verdicts. "In reviewing the propriety of a jury verdict, [this Court's] obligation is to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989). *See also Bruce Lincoln–Mercury, Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 21 (3d Cir.1963). This court must defer to the jury whenever its findings are reasonably supported by the record, and must draw all reasonable inferences in favor of the verdict winner. *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 372 (3d Cir.1987) (*citing Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.1983)).

## II. Discussion

Because plaintiff's motion to alter or amend the judgment and his motion for a new trial are both, in part, based on his assertion that this court misapplied the comparative fault provisions of New Jersey's product liability law, I will briefly discuss this issue before turning to plaintiff's other contentions.

█ The product liability law of New Jersey recognizes that accidental injuries are often the result of a combination of causes. However, the doctrine of strict liability strikes a balance in favor of plaintiffs by requiring a defendant to produce evidence that the plaintiff voluntarily encountered a known danger, *before* the jury is allowed to compare the plaintiff's conduct with the alleged product defect on the question of causation. *Cartel Capital Corp. v. Fireco of N.J.*, 81 N.J. 548, 562–63, 410 A.2d 674 (1980). This balance advances the overall purpose of New Jersey's product liability law by stressing the manufacturer's primary responsibility to design and market safe products. Nevertheless, when the evidence points to a voluntary assumption of a known risk, it is proper to instruct the jury on comparative fault. *Ladner v. Mercedes–Benz*, 266 N.J.Super. 481, 495, 630 A.2d 308 (App.Div.1993), *certif. denied*, 135 N.J. 302, 639 A.2d 301 (1994).

Hulmes asks this court to amend the judgment so as to award him damages based upon the jury's finding that the ATV was defective by reason of a failure to warn, notwithstanding the jury's finding as to his comparative fault, which Hulmes argues is "irrelevant" to his failure to warn claim. Alternatively, plaintiff seeks a new trial based upon his contention that his is not a case to which comparative fault properly applies.

### A. Plaintiff's Motion to Alter or Amend the Judgment

█ Hulmes first contends that he is entitled to judgment in his favor based upon the jury's finding of a failure to warn, and asks this court to enter judgment in the full amount of the jury's verdict. Plaintiff argues that the jury's assignment of comparative fault is irrelevant on the question of defendants' failure to warn.[2]

2. Elsewhere, Hulmes contends that it was error to give the charge on comparative fault, even as

At trial, Hulmes claimed not to have received certain warnings which were distributed by Honda some years after he had purchased his ATV. Hulmes testified that, had he received these warnings concerning the ATV's safety, he "would have got rid of it." Tr. of Oct. 1, 1996, part A, at 42. The jury found that the ATV was defective by reason of Honda's failure to warn of the danger of severe injury which could result from roll-over or tip-over accidents in which the rider is jettisoned. Plaintiff argues that comparative fault is inapplicable "where the harm incurred is the very risk about which defendant had a duty to warn." *Crispin v. Volkswagenwerk AG,* 248 N.J.Super. 540, 565, 591 A.2d 966 (App.Div.), *certif. denied,* 126 N.J. 385, 599 A.2d 162 (1991).

In *Crispin,* the trial court declined to reduce the jury's award by the 25 percent by which the jury had found the plaintiff at fault. *Id.* at 549, 591 A.2d 966. The trial court based its decision upon the fact that the jury had found the defendant liable on a failure to warn theory. *Id.* The Appellate Division affirmed, while stressing that the case was "unique" because it presented a pure "second collision" scenario. *Id.* at 564, 567, 591 A.2d 966. In a "crashworthiness," or "second collision" case, the jury is only concerned with the incremental injuries suffered as the result of the defect. In *Crispin,* the jury found that Volkswagen failed to warn the plaintiff that the use of a seat belt was especially necessary "in light of the collapsing seat, a feature built into the automobile by design." *Id.* at 565, 591 A.2d 966. The Appellate Division concluded that, because the only damages at issue were those that resulted from the "second collision," the plaintiff's contributory fault *"in causing the original accident* was not at issue." *Id.* at 568, 591 A.2d 966 (emphasis added).

In the singular context of "second collision" injuries, a defendant's failure to warn a user of its product of a "special requirement," without which the product will be unsafe, may well preclude consideration of comparative fault. In *Crispin,* the Appellate Division concluded that the plaintiff should not be penalized for failure to use a seat belt

to his claim of design defect. This contention is

when the *special* importance of using a seat belt in view of the automobile's peculiar seat design was not conveyed to him. By contrast, the warning which Honda failed to deliver to Hulmes, Exhibit P–524, did not outline any specific action or steps that Hulmes should have taken to avoid the accident in question. It merely warned, albeit in some detail, that roll-over or ejection accidents were a possible result of even a minor collision. This is simply not a case in which application of comparative fault principles would, in effect, blame the plaintiff for not doing something which he was not told he should do. On the contrary, plaintiff's testimony that he would have "gotten rid" of the ATV had he been warned of its instability, belies his assertion that this case is controlled by *Crispin.* Hulmes's accident was not "caused" by his failure to "get rid" of the ATV, except in the most tenuous sense, nor was it shown at trial that the absent warning would have urged ATV owners to dispose of their ATVs.

Moreover, the plaintiff's failure to use a seat belt was the *only* contributing cause on the plaintiff's part which was asserted in *Crispin.* Here, evidence was presented that Hulmes was riding his ATV while intoxicated, that he was exceeding the speed limit on a paved road, and that he collided with his brother's all terrain vehicle.

Crispin was further vindicated by the jury's finding that the seat design was defective. The jury in this case found no design defect in the Honda ATV. Plaintiff's failure to warn theory, on which the jury held the defendants liable, did not encompass warnings against riding while intoxicated, which warnings were certainly given, or warnings against driving at excessive speed. In sum, there is an insufficient nexus between the defendants' failure to warn Hulmes of the need to exercise caution when riding his ATV, and Hulmes's comparative fault in causing the accident to sustain the comparison with *Crispin.*

Plaintiff also argues that the "heeding presumption" enunciated in *Coffman v. Keene Corp.,* 133 N.J. 581, 628 A.2d 710 (1993), sets

addressed, and refuted, in part II.B.4, *infra.*

forth an independent comparative fault analysis, which displaces traditional comparative fault and renders any instruction on comparative fault erroneous. Plaintiff's Brief at 12–13. In essence, plaintiff suggests that when a jury finds a failure to warn defect and, in addition, finds that the defendant has failed to rebut the "heeding presumption," a directed verdict in plaintiff's favor is mandated. The "heeding presumption," however, does not sweep so broadly.

*Coffman* held that the failure to rebut the "heeding presumption" "may constitute proof that a defendant's failure to warn contributed to the plaintiff's injuries." *Coffman,* 133 N.J. at 591, 628 A.2d 710. *Coffman* was a multiple defendant asbestos case. The jury was instructed to apportion liability among the nine defendants.[3] It is not clear that the jury in *Coffman* apportioned any fault to the plaintiff.

On appeal, Keene Corp. argued that the burden should be upon the plaintiff to prove that he would have heeded a proper warning and thereby avoided the inhalation of asbestos fibers. The Supreme Court of New Jersey rejected this argument, deciding as a matter of public policy to place the burden on the manufacturer to rebut a presumption that the plaintiff would have heeded a proper warning. *Id.* at 603, 628 A.2d 710. In *dicta,* the *Coffman* court seems to equate evidence of the comparative fault of the plaintiff with evidence which would rebut the "heeding presumption." *Id.* This is unsurprising, in that a defendant will normally produce evidence of the plaintiff's comparative fault on all issues relating to causation, including the "heeding presumption." *Coffman* simply did not address a plaintiff's comparative fault in the context of multiple causative factors.

In this case, the jury was charged that unless Honda succeeded in rebutting the heeding presumption, it must find that the "plaintiff has demonstrated that the inadequate warning was a proximate cause of his injuries." Tr. of Oct. 23, 1996 at 78. Even

after giving Hulmes the benefit of the "heeding presumption," the jury was not required to find that the failure to warn was the *sole* proximate cause of Hulmes's injuries.

In this case, the jury heard evidence that Hulmes made modifications to his ATV to increase its performance, that Hulmes was riding at an excessive speed, and that Hulmes had consumed alcohol shortly before his tragic accident. In light of all the evidence, the jury could have concluded that the failure to warn, even though it was *one* proximate cause of the plaintiff's injuries, was not the sole, or even the major contributing factor in causing the accident.

In his reply brief, plaintiff restates his arguments, again suggesting that to sustain the jury's verdict for the defendants in this case would allow "mere negligence" on the plaintiff's part to support the defense of comparative fault. Reply Brief at 6–7. This is not so.

■ Plaintiff is correct that in strict product liability cases, as a general rule, once the jury has found that the defect was a substantial causative factor, the proximate cause inquiry is at an end and the defendant is liable. However, where the evidence supports a charge on comparative fault, that is, where there is competent evidence that the plaintiff voluntarily encountered a known danger, the proximate cause inquiry must continue. In this case, the jury proceeded to compare the fault of the plaintiff with that of the defendants in causing the accident. It was required to do so because there was evidence from which it could have concluded that Hulmes, an experienced ATV rider, knew of the danger from riding while intoxicated, that he knew of the risk of injury from a collision, and that he proceeded in spite of these "known dangers." That there may have been some other danger highlighted in P–524[4] which was not then known to plaintiff does not mean that Hulmes did not voluntarily encounter a known danger. It merely proves that he did not voluntarily encounter

---

3. Keene Corp., the only defendant to appeal, was assigned fifteen (15) percent of the causative fault. *Coffman,* 133 N.J. at 593, 628 A.2d 710.

4. P–524 is a warning issued to ATV owners by Honda through its dealers pursuant to a consent decree with the Consumer Products Safety Commission. Hulmes apparently never received this warning at the time it was issued.

the danger described in P–524. Based upon the evidence presented, the jury allocated to Honda thirty-four (34) percent of the fault for causing the accident, the amount which the jury found was related to Honda's failure to warn.

It is telling that plaintiff maintains that the jury's finding of liability for a failure to warn and its allocation of fault are not "inconsistent" verdicts. *See* Reply Brief at 5 n. 3. Rather, plaintiff insists that the allocation of fault is simply "irrelevant" in a failure to warn case. *Id.; see also* Plaintiff's Brief at 2. This argument proves too much. Several New Jersey cases support the application of comparative fault principles to a failure to warn case. *See Ladner,* 266 N.J.Super. at 483, 630 A.2d 308; *Dixon v. Jacobsen Mfg. Co.,* 270 N.J.Super. 569, 592, 637 A.2d 915 (App.Div.1994); *Butler v. PPG Indus.,* 201 N.J.Super. 558, 564–65, 493 A.2d 619 (App. Div.1985). If Hulmes were correct that a comparison of a plaintiff's and defendant's degrees of causative fault is always irrelevant once the jury has found a failure to warn, these cases would presumably say so. They do not so hold.

■■■ Because the plaintiff has failed to demonstrate that the jury's assignment of sixty-six (66) percent of the causative fault to the plaintiff was inconsistent with its finding that a failure to warn was a proximate cause of the accident, plaintiff's motion to alter or amend the judgment will be denied.[5]

### B. *Plaintiff's Motion for a New Trial*

In support of his motion for a new trial, plaintiff claims that this court erred in ruling on several evidentiary issues, and in its instructions to the jury. Plaintiff also contends that the verdict was against the weight of the evidence and that the trial was fundamentally unfair.

■■■ "Where a contention for a new trial is based on the admissibility of evidence, the trial court has great discretion ... which

will not be disturbed on appeal absent a finding of abuse." *Link v. Mercedes–Benz,* 788 F.2d 918, 921 (3d Cir.1986). On a claim that the trial court erroneously instructed the jury, the court must review the charge as a whole, in light of the evidence, to determine whether it adequately conveyed the controlling legal principles. *Id.* at 922.

#### 1. *The Admission of Evidence of Alcohol Consumption*

■■ Hulmes contends that this court erred in admitting evidence that he had consumed alcohol shortly before the accident which led to this lawsuit. The court first ruled on this issue on plaintiff's motion *in limine* seeking to exclude all such evidence. *Hulmes v. Honda Motor Co.,* 936 F.Supp. 195 (D.N.J.1996). The court revisited this issue on plaintiff's motion for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 207–12. Despite these earlier rulings, plaintiff's counsel once again attempted to "reargue" the admissibility of this evidence when other pre-trial motions were decided immediately following jury selection. Tr. of Sept. 24, 1996 at 7–20.

Plaintiff's motion for a new trial based upon this court's denial of his motion *in limine* to exclude all evidence of alcohol consumption presents no new arguments. There is nothing this court can add to what it has previously written on this subject. It is sufficient to note that plaintiff argues for a *per se* rule against the admission of evidence of alcohol consumption by a plaintiff in a civil trial in the "absence of traditional forms of 'supplemental evidence.'" Plaintiff's Brief at 18. By "traditional forms," plaintiff presumably means eyewitness testimony that the plaintiff was visibly affected either in motor coordination, or speech by alcohol. For obvious reasons no such evidence was presented at this trial. However, the cases do not support the *per se* rule for which the plaintiff contends. Indeed, in *Guzzi v.*

---

5. Plaintiff also renews his motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), relying on the same arguments presented in his motion to alter or amend the judgment. Plaintiff's Brief at 14–15. Judgment as a matter of law "is an extraordinary remedy when urged

by an unsuccessful plaintiff who bore the burden of proof at trial." *Link v. Mercedes–Benz,* 788 F.2d 918, 921 (3d Cir.1986). Because there was ample evidence introduced at trial to support the jury's verdict, judgment as a matter of law must be denied.

*Clarke*, 252 N.J.Super. 361, 599 A.2d 956 (L.Div.1991), the Law Division admitted evidence of alcohol consumption absent any evidence of "drunken behavior." *Id.* at 366, 599 A.2d 956. Plaintiff makes no effort to distinguish *Guzzi*. Instead, plaintiff again mischaracterizes this court's holding. This court did not proclaim that a .10 percent blood alcohol content itself rendered alcohol evidence admissible. Rather, this court ruled that a .10 percent BAC, when considered with independent evidence that alcohol had been consumed,[6] could constitute supplementary evidence of unfitness to drive, at least as competent as "traditional" eyewitness testimony of "drunken behavior." *Hulmes*, 936 F.Supp. at 205–06.

### 2. Specific Evidence of Alcohol Consumption

Plaintiff contends that, notwithstanding this court's decision to admit such evidence, the evidence of alcohol consumption which was admitted in this case was irrelevant, and therefore should have been excluded under Fed.R.Evid. 401.

Hulmes contends that the evidence of alcohol consumption was irrelevant to his design defect claim because that claim was based upon a theory that the ATV's instability caused it to flip over and eject the rider after the wheel of Hulmes's ATV impacted the wheel of his brother's ATV. Hulmes argues that it was at this moment that the alleged design defect came into play, and therefore, that nothing that occurred before the wheels of the two ATVs touched is relevant, and once the collision occurred, there was nothing that Hulmes could have done to prevent the unfortunate results of the accident.

In deciding plaintiff's motion *in limine* on this subject, this court opined that evidence of alcohol consumption may be relevant in a product liability action on the issues of misuse and proximate cause. *Hulmes*, 936 F.Supp. at 201. Plaintiff now seeks to focus the design defect inquiry entirely on the events that took place after the collision of the two ATVs. Plaintiff cannot now contend that Hulmes's behavior before the wheels of the two ATVs touched is irrelevant to the proximate cause inquiry, without also requiring this court to engage in a "crashworthiness" or "second collision" analysis. Plaintiff, however, never pursued a "crashworthiness" theory at trial.[7] Accordingly, the jury had to determine the cause or causes of this accident from the totality of the circumstances. The plaintiff's fitness to drive bears directly upon that determination.

Hulmes similarly takes issue with this court's conclusion that evidence of alcohol consumption was relevant to his failure to warn theory. *Id.* Plaintiff contends that the rationale for this court's conclusion "must be that a [blood alcohol content] between .09% and .11% could theoretically make the needed warning incoherent." Plaintiff's Brief at 21. Hulmes then argues that such evidence is irrelevant because "the needed warning should have been given to him years prior to the day of the accident." *Id.* This argument is disingenuous. As this court has previously explained, evidence of alcohol consumption is relevant in a failure to warn case to rebut the "heeding presumption." *Hulmes*, 936 F.Supp. at 201. Clearly, evidence that a plaintiff who has been warned about consuming alcohol prior to riding his ATV, and nevertheless, does so, is relevant to rebut the "heeding presumption," in that it portrays an individual who is unlikely to heed warnings. Accordingly, plaintiff's challenge to the evi-

---

**6.** For example, in this case there was testimony from the flight nurse on the medivac helicopter that an amber fluid smelling of alcohol was suctioned from the plaintiff's stomach shortly after the accident. Tr. of Oct. 8, 1996 at 204–07.

**7.** Counsel for plaintiff did argue that his client's behavior prior to the touching of the tires was irrelevant, *see* Tr. of Sept. 24, 1996 at 14, but he never presented a "second collision" scenario either to this court or to the jury. Notably, in a "crashworthiness" case, it is the plaintiff who

must demonstrate what percentage of his or her injuries are directly attributable to the "second collision" and what percentage would have occurred as a result of the "first collision," even if an alternative safer design had been used in the product in question. *See Huddell v. Levin*, 537 F.2d 726, 737–38 (3d Cir.1976). In other words, the burden rests upon the plaintiff in such cases to prove the extent of enhanced injuries attributable to the defective design.

dence of alcohol consumption based upon relevance is without merit.

■ More specifically, Hulmes criticizes the admission of a Cooper Hospital Lab Report reflecting plaintiff's serum blood alcohol level at or around the time of his admission. Plaintiff contends that the lab report is inadmissible hearsay. Hulmes further contends that this court never specifically addressed his objection to the lab report on hearsay grounds, but only addressed the authentication issue. *See Hulmes,* 936 F.Supp. at 206–07. Plaintiff suggests that this court "misconstrued" his arguments on the *in limine* motion. Plaintiff's Brief at 27. If so, plaintiff had numerous opportunities to disabuse the court of its "misconstruction."

On October 15, 1996, before defendants' expert, Dr. Herbert Moskowitz, testified, the following exchange occurred between plaintiff's counsel and the court regarding the admissibility of the Cooper Hospital Lab Report.

> THE COURT: Your objection is the admissibility of the Cooper Hospital records?
>
> MR. LEVIN: That's correct.
>
> THE COURT: And reliability of the information contained therein?
>
> MR. LEVIN: Our objection is specifically focused on the lab report.
>
> THE COURT: Well whatever, it's the Cooper Hospital record and particularly the lab report which is reflected in the Cooper Hospital records.
>
> MR. LEVIN: Yes.
>
> THE COURT: And I have ruled on that already in that opinion.
>
> MR. LEVIN: My concern was that the record as it was reflected in the motion *in limine* does not show in terms of close particularity the basis of our concerns with the accuracy of that record.
>
> THE COURT: Well, your concern is with a specific entry on that record, is it not?
>
> MR. LEVIN: Yes, sir.
>
> THE COURT: Well this dealt with the admissibility of the Cooper Hospital records. And obviously, you'll have a chance to contest on cross-examination and through your own rebuttal expert the reli-

ability of the entry. So I think if your concern is have you preserved the objection—

> MR. LEVIN: That's one of my concerns.
>
> THE COURT: You have.
>
> MR. LEVIN: Thank you.

Tr. of Oct. 15, 1996 at 147–48. Hulmes now contends that Honda failed to establish through the testimony of a "qualified witness" that the lab report at issue was trustworthy under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). Honda insists that Hulmes waived this objection by not raising it at trial. Plaintiff's counsel cryptically observed on October 15th that the record might not "show in terms of close particularity the basis of our concerns with the accuracy of that record," referring to the lab report. Nowhere in the course of this colloquy did plaintiff's counsel utter the word "hearsay" or refer to Fed.R.Evid. 803(6).

On September 24, 1996, before the jury was selected, counsel addressed the admissibility of the alcohol-related evidence. Again, plaintiff's counsel objected to this evidence, including the Cooper Hospital lab report, about which the following exchange occurred:

> THE COURT: Let's be specific so that I and [defendants' counsel] know what you're talking about.
>
> MR. LEVIN: Okay.
>
> THE COURT: There is evidence of a blood alcohol test?
>
> MR. LEVIN: Yes. And, your Honor has allowed that subject to—
>
> THE COURT: I'll allow that.
>
> MR. LEVIN: Subject to cross-examination.

Tr. of Sept. 24, 1996 at 21. Once again, this court's ruling on the plaintiff's *in limine* motion to exclude this evidence was alluded to by plaintiff's counsel and nowhere was an objection made based on hearsay grounds, or a reference made to Fed. R. Evid 803(6).

Plaintiff's omission of any reference to the hearsay rule is especially glaring when this court pointed to Rule 803(6) in its Opinion on the motion *in limine*, noting that "some courts have ruled that blood tests conducted

as a routine matter in a hospital are admissible under Fed.R.Evid. 803(6), which does not require the proponent to establish a 'chain of custody.'" *Hulmes,* 936 F.Supp. at 207 n. 9 (citations omitted). Moreover, on the motion *in limine,* Honda submitted a lengthy deposition of a senior technologist in the Cooper Hospital chemistry laboratory, Ms. Barbara Snyder, recounting the procedures which are followed to safeguard blood samples. Plaintiff protests, as he did in arguing the *in limine* motions, that the identity of the technician who drew the blood for the test is unknown, as is the identity of the technician who performed the tests or entered the results into the computer. As noted, the records of the exact time of the blood test and of the most recent calibration of the test equipment were unavailable as a result of Cooper Hospital's document retention policy. *See Hulmes,* 936 F.Supp. at 206–07. Plaintiff recognizes that it is his burden to show that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Plaintiff's Brief at 29 (citing *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 289 (3d Cir. 1983)). Plaintiff must point to "[d]eficiencies in the manner in which specific records are kept." *In re Japanese Electronic Products,* 723 F.2d at 289. The absence of information due to the expiration of the hospital's standard document retention period simply does nothing to support an assertion of lack of trustworthiness.

Furthermore, it is clear that Ms. Snyder was a "qualified person," within the meaning of Rule 803(6), who could have testified to the regular business practices of the Cooper Hospital chemistry laboratory.[8] Plaintiff cannot now be heard to complain that she did not testify, especially in light of plaintiff's repeated opportunities to state his hearsay objection to this report, and his repeated failure to make this objection plain. For these reasons, plaintiff's motion for a new trial based upon his belated hearsay objection to the Cooper Hospital lab report must be denied.

### 3. Violation of Statute

■ Plaintiff contends that it was error for the court to instruct the jury on New Jersey's Motor Vehicle law on operating a motor vehicle with a blood alcohol concentration of 0.10 percent or more by weight and on exceeding the legal speed limit of twenty-five (25) miles per hour.

Plaintiff's sole support for this assertion of error is *Ladner v. Mercedes–Benz,* 266 N.J.Super. 481, 630 A.2d 308, in which the Appellate Division held that it was error to instruct the jury on the statutory requirement that vehicle operators set the parking brake because it invited the jury to consider the plaintiff's negligence on the fifth prong of the risk/utility analysis.[9] *See Ladner,* 266 N.J.Super. at 492–93, 630 A.2d 308. The Appellate Division's recommendation was a limiting instruction. *Id.* at 493–94, 630 A.2d 308. In this case, the jury received just such a limiting instruction. The jury was specifically charged that it could only consider a violation of either statute "on the question whether plaintiff would have heeded an adequate warning had one been given." Tr. of Oct. 23, 1996 at 78.

If, as plaintiff goes on to suggest, it was error to give these instructions because they were only marginally relevant to the "heeding presumption," it was surely harmless error. The jury found that Honda was liable for its failure to warn the plaintiff. Implicit in that finding is the jury's conclusion that Honda failed to rebut the "heeding presumption." Accordingly, the instructions on statutory violations, even if error, cannot support a motion for a new trial.

---

8. A party seeking to introduce evidence under Rule 803(6) need not "be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based." Federal Rules of Evidence, Note to Paragraph (6), 1974 Enactment, *Federal Civil Judicial Procedure and Rules* 393 (West 1996).

9. This prong is generally stated as: The ability of foreseeable users to avoid danger by the exercise of care in the use of the product. See *Cepeda v. Cumberland Engineering Co.,* 76 N.J. 152, 174, 386 A.2d 816 (1978).

#### 4. The Comparative Fault Instruction

■ Hulmes contends that it was error to instruct the jury on comparative fault, and that he is therefore entitled to a new trial. Plaintiff correctly notes that a comparative fault charge in a products liability action is only permissible when the evidence supports a finding that the plaintiff voluntarily and knowingly encountered a risk of injury from a defective product. *Johansen v. Makita USA, Inc.*, 128 N.J. 86, 94, 607 A.2d 637 (1992). Hulmes contends that the court's charge on comparative fault was not tailored to the specific design defect alleged in this case, *i.e.*, the instability of the ATV and its lack of bumpers on the rear wheels. Plaintiff essentially contends that the charge on comparative fault allowed the jury to define the "known danger" which plaintiff voluntarily encountered at too high a level of generality. There is no merit to this contention.

■ In keeping with New Jersey's Model Jury Charges—Civil §§ 5.34H and 5.34I, the jury was instructed that, only if it found that "Robert Hulmes was at fault by voluntarily and unreasonably proceeding to encounter a known danger and that action was a proximate cause of the accident," should it proceed to "compare the fault of each party." Tr. of Oct. 23, 1996 at 79–80. As to the alleged design defect, the instability and lack of a bumper system, the jury found, in response to special interrogatory number 1–A, that there was no design defect in the Honda ATC250R. Clearly, the jury was not asked to compare, and it must be assumed that it did not compare, the fault of Honda in defectively designing the ATV with the fault of Hulmes in voluntarily encountering a "known danger." Indeed, the jury need not even have considered the questions of design defect and nature of the "known danger" together. Had it done so, the jury must necessarily have set the fault of Honda at 0%, since it found no design defect. Accordingly, even if it was error to instruct the jury on comparative fault as it related to the issue of "design defect," the error was harmless.

■ "As a threshold matter, a party challenging a jury instruction on a particular matter must establish that the jury in fact reached that matter. A motion for a new trial on issues that a jury did not reach will not be granted." *Farra v. Stanley–Bostitch, Inc.*, 838 F.Supp. 1021, 1027 (E.D.Pa.1993) (citing *Markovich v. Bell Helicopter Textron, Inc.*, 805 F.Supp. 1231, 1241 (E.D.Pa.), *aff'd*, 977 F.2d 568 (3d Cir.1992); *Field v. Omaha Standard, Inc.*, 582 F.Supp. 323, 332 (E.D.Pa.1983), *aff'd*, 732 F.2d 145 (3d Cir. 1984)), *aff'd*, 31 F.3d 1171 (3d Cir.1994). The conclusion that the jury need not have reached the comparative fault issue on the question of design defect is inescapable. This alone is sufficient to deny plaintiff the relief he requests in this portion of his motion.

■ More importantly, however, this case properly raised an issue of plaintiff's comparative fault. Plaintiff seeks to define the "known danger" element as the danger presented by an allegedly unstable design and the absence of rear wheel bumpers. Plaintiff characterizes defendants' definition of the same element as mere knowledge that one can be injured in an accident, which plaintiff claims would erase the threshold requirement of a knowing assumption of risk. Neither of these end points properly defines the test of a known risk. The precise nature of the "known danger" which the plaintiff is said to voluntarily encounter must be defined by the facts of the individual case. It should not be defined so broadly that mere negligence by the plaintiff can be equated with voluntarily encountering a "known danger." Neither can the term be defined so narrowly that the jury is prevented from considering a plaintiff's comparative fault unless it can be shown that the plaintiff was aware of the precise defect which is alleged to have caused her injuries. The cases speak of a "known danger" not a "known defect." *See Ladner*, 266 N.J.Super. at 495, 630 A.2d 308 ("It is not knowledge of the defect ... that is required to be proven, but, rather, evidence that plaintiff voluntarily and unreasonably encountered a known danger.").

*Lewis v. American Cyanamid Co.*, 294 N.J.Super. 53, 682 A.2d 724 (App.Div.1996), is instructive on this important distinction. In *Lewis*, the plaintiff was injured when an aerosol insecticide which he was using in his

kitchen caught fire. The Appellate Division discussed, in considerable detail, the New Jersey rule on comparative fault in product liability actions, before remanding the case for reconsideration, *inter alia,* of whether the plaintiff had actual knowledge of the particular risk of fire as opposed to a mere generalized knowledge of the risk of injury, possibly from the toxicity of the insecticide.[10]

Hulmes argued at trial that the ATV was defectively designed because it was unreasonably unstable and could easily roll over in the event of an accident, throwing the rider. The "danger" he must knowingly have encountered, therefore, is the danger of injury from a similar accident. There was evidence that Hulmes was aware of this danger, even if he was unaware of the exact center of gravity of his ATV. Plaintiff testified that he was aware of the danger presented by a collision. Tr. of Oct. 1, 1996, part B, at 55. Hulmes also testified that his brother punctured his lung after being thrown from a four-wheeled ATV. *Id.* at 61–63.

In *Dixon v. Jacobsen Mfg. Co.,* 270 N.J.Super. 569, 592, 637 A.2d 915 (App.Div.1994), the plaintiff testified that he was unaware that a rotating impeller blade was located in a snowthrower's discharge chute, therefore, he could not be contributorily at fault for the accident which severed some of his fingers. The Appellate Division held that the testimony created a jury question on contributory fault, because the jury could have inferred a knowledge of the relevant danger from the plaintiff's testimony. Here, Hulmes testified that he did not know and had never asked about the details of his brother's ATV accident. Tr. of Oct. 1, 1996, part B, at 62. Hulmes's brother, Nicholas, testified that Hulmes may have been there at the time of his own ATV accident and that he and his brother may have witnessed other riders involved in ATV accidents. Tr. of Oct. 3, 1996, part A, at 49–51. These testimonial inconsistencies presented a jury question as to whether Hulmes was aware of the danger of an accident similar to the one in which he was involved, and yet voluntarily encoun-

tered that danger. Accordingly, there was ample justification for a jury charge on comparative fault in this case.

### 5. The "U–Haul Documents"

■ Plaintiff contends that this court erred in excluding certain warning labels produced by U–Haul for a fleet of Honda ATVs which it maintained for the rental market. These labels were attached to the U–Haul ATVs and were more detailed and extensive than the warning labels that appeared on Hulmes's Honda ATC250R.

At the July 1, 1996 hearing on the motions *in limine,* and again on October 3, 1996, the court expressed concern that U–Haul might not have been qualified to design an appropriate warning label for an ATV, and the record was devoid of any testimony from a representative of U–Haul regarding these warnings. Tr. of July 1, 1996 at 161–72; Tr. of Oct. 3, 1996, part B, at 54. This, concern, however, largely preceded plaintiff's counsel's suggestion that he sought to introduce the U–Haul warnings only for notice. *Id.* at 55. On this motion, Hulmes repeats his assertion that these documents constituted "vivid evidence" of notice. Plaintiff's Brief at 38. Plaintiff contends that this court "misconstrued the vividness of the evidence to prove just what it was offered for as undue prejudice to Honda." *Id.*

As the court understands plaintiff's argument, these documents were offered as evidence of notice that U–Haul considered the warnings Honda provided with its vehicles inadequate in view of the purposes for which U–Haul had purchased these ATVs. This court's conclusion that plaintiff did not lay a sufficient foundation as to U–Haul's purpose and experience with these vehicles goes directly to plaintiff's notice argument. Thus, this court's concern with the "content" of the U–Haul warnings was not the result of some mistaken notion that plaintiff sought to intro-

---

10. It must be noted that the Appellate Division criticized the trial court's jury charge, which apparently did not track the language of § 5.34H of the Model Jury Charges–Civil. *Lewis,* 294

N.J.Super. at 79, 682 A.2d 724. In Hulmes's case, the jury was charged in accordance with § 5.34H.

duce these documents for their truth.[11] Rather, that concern addressed the nature of the notice these documents purportedly gave to Honda. Plaintiff simply never established what this notice contained, other than notice that U–Haul put additional warning labels on its ATVs. This fact is, at best, of marginal relevance in a case of a purchaser of an ATV, not of the same model as those in the U–Haul fleet, who admitted to having read the owner's manual that accompanied his ATV "cover to cover." Tr. of Oct. 1, 1996, part B, at 4.

Moreover, insofar as these documents provided any notice of the insufficiencies of Honda's warnings, the U–Haul documents were cumulative of much of the plaintiff's evidence, as the court pointed out at the time. Tr. of Oct. 3, 1996 at 60. Ultimately, this court excluded these documents because they were potentially inflammatory and confusing to the jury, as well as cumulative of other evidence. Id. at 64–65. Plaintiff has not demonstrated that, in so doing, this court misapplied Fed. R.Evid. 403.

 Indeed, plaintiff cannot demonstrate any prejudice from the exclusion of these documents, much less any impact on his substantial rights, because the jury found in his favor on the failure to warn theory, and it was on notice of the adequacy of the warning that plaintiff sought to introduce this evidence. For all these reasons, a new trial on this basis must be denied.

### 6. Lay Opinion Testimony

Plaintiff contends that this court erred in admitting the opinion of Officer James Mikulski under Fed.R.Evid. 701. Rule 701 allows opinions of non-experts to be heard when those opinions or inferences are "rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701.

Based upon his post-accident investigation, Officer Mikulski testified that Hulmes was traveling over the posted speed limit of twenty-five (25) miles per hour at the time of the accident. Tr. of Oct. 8, 1996 at 174. Officer Mikulski also offered his opinion that the accident resulted from "driver inattention" because he could find no "debris" or other impediments which might have caused the accident. Id. at 177–78. Plaintiff's counsel cross-examined Officer Mikulski at some length about the measurements upon which he based his conclusions regarding the speed of Hulmes's ATV, concluding:

Q. You are not saying here today that you have any real scientific technical accurate focused determination that this is the precise spot where the event occurred; is that right?

A. That's correct, sir.

Id. at 193.

 This issue was explored during the consideration of the parties' numerous motions in limine. At that time, this court noted that lay opinions of a technical nature may only be admitted when "the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion." Asplundh Mfg. Div. v. Benton Harbor Engineering, 57 F.3d 1190, 1202 (3d Cir. 1995). Asplundh further requires the proponent of lay opinion testimony to demonstrate "some connection between the special knowledge or experience of the witness, however acquired, and the witness's opinion." Id.

 In keeping with the Asplundh standard, this court determined that Officer Mikulski had been a Mantua Township police officer for approximately five years at the time of the accident, before which he had worked in the Gloucester County sheriff's department for six years. Officer Mikulski is a graduate of the Camden City Police Academy. Although "particular educational training is of course not necessary," id., Officer Mikulski testified that, since graduation from the police academy, he had completed three additional courses related to motor vehicle accident investigation. Tr. of Oct. 8, 1996 at 135. Officer Mikulski also testified that he had investigated from fifty to one hundred motor vehicle accidents prior to Hulmes's accident. Id. at 136.

11. Exhibit P–594, for example, warned that the vehicle could "flip every which way."

Plaintiff's sole ground for attacking Officer Mikulski's testimony is that Officer Mikulski is not competent to offer an opinion on a "technical" matter such as the speed of the ATV or the cause of the accident. Plaintiff does not suggest that Officer Mikulski's opinion is based on other opinions or reports or on anything other than the facts as they appeared to him at the scene of the accident. Rather, plaintiff claims that Officer Mikulski's testimony, because it did not demonstrate his "familiarity with the influences of the vehicle's design on flipping," should have been excluded. Plaintiff urges upon this court a singularly broad reading of *Asplundh.*

In *Asplundh,* a maintenance supervisor, who "[did] not seem to have anything to do with designing or evaluating the design of machinery," testified that a piece of machinery had failed due to metal fatigue which he attributed to faulty design. *Asplundh,* 57 F.3d at 1205. The correlative would exist in this case had Officer Mikulski, lacking any experience in ATV design, testified that Hulmes's accident was caused by design flaws in the Honda ATC250R. The proposition that a lay witness cannot give an opinion which must necessarily be based upon expertise which he lacks, does not lead to the conclusion that a lay witness may never testify unless he has technical expertise in all aspects of the case. To read *Asplundh* for this proposition would completely eliminate lay opinion testimony from any case involving a "technical" issue. This cannot have been the Third Circuit's intention.

Officer Mikulski's duty in investigating Hulmes's accident required him to form an opinion as to the cause of the accident and to note that opinion on the accident investigation form. *See Ernst v. Ace Motor Sales, Inc.,* 550 F.Supp. 1220, 1223–24 (E.D.Pa. 1982), *aff'd,* 720 F.2d 661 (3d Cir.1983) (police officer who arrived at the scene of an automobile accident was permitted to testify to the point of impact as a lay witness based on his experience and his perception of physical evidence at the scene). Officer Mikulski testified at trial to no more than he was required to observe in his professional capacity. Plaintiff was given ample opportunity to cross-examine Officer Mikulski and to challenge his testimony before the jury. Accordingly, plaintiff's motion for a new trial on this ground will be denied.

### 7. The "Ultimate Outcome" Charge

Plaintiff contends that this court erred in failing to instruct the jury on the "ultimate outcome" of its deliberations on the comparative fault of the parties, that is, that a finding of fifty-one (51) percent or greater causative fault on the part of Hulmes would bar his recovery. Although plaintiff's counsel now stresses the importance of an "ultimate outcome" charge to his case, he was slow to assert this argument at trial.

Neither plaintiff's original requested points for charge, nor his amended requests, contained an "ultimate outcome" charge. This omission might be interpreted merely to reflect plaintiff's belief, which is vigorously pressed in this motion, that a comparative fault charge was never appropriate in this case. Notably, however, plaintiff opposed the comparative fault charge immediately after seeing a first draft of the court's instructions to the jury without mentioning the "ultimate outcome" charge. Tr. of Oct. 22, 1996 at 229–44. The following morning, the court returned to the draft jury instructions and special interrogatories. Tr. of Oct. 23, 1996 at 2. At that time, plaintiff pressed a distinct request, based on New Jersey's Model Jury Charge § 5.34G, for a limiting instruction on proximate cause "where comparative negligence is not applicable." *See* Plaintiff's Requested Point for Charge No. 22, subsection 2. The court ultimately refused to give this charge based upon its conclusion that the doctrine of comparative fault was applicable to this case. Tr. of Oct. 23, 1996 at 17. Plaintiff's counsel concluded:

THE COURT: Is there anything else you wish to place on the record, Mr. Levin? You want to consult with your counsel?

MR. LEVIN: Yes, sir.

(short pause)

MR. LEVIN: Thank you, your Honor, nothing else on the points for charge or the jury verdicts.

THE COURT: Pardon?

MR. LEVIN: Nothing else on the points for charge or the jury verdict.

Tr. of Oct. 23, 1996 at 22. Following some discussion of the exhibit list, the jury was brought in and the charge read. *Id.* at 46–98. Not until the court asked for any "additional objections" to the charge did plaintiff's counsel first address the omission of an "ultimate outcome" charge. *Id.* at 100. Even then, counsel was unable to cite any New Jersey caselaw in support of such an instruction in a product liability case. *Id.* at 101. Plaintiff now asserts that the omission of an "ultimate outcome" charge in this case adversely affected his substantial rights, necessitating a new trial. I disagree.

■ In *Roman v. Mitchell,* 82 N.J. 336, 413 A.2d 322 (1980), the Supreme Court of New Jersey held that trial courts should instruct the jury as to the legal effect of the application of the comparative negligence statute to the jury's findings. That court also observed, "[t]here is nothing in the statute which specifically requires that the jury be instructed" on the ultimate outcome. *Id.* at 345, 413 A.2d 322. The rule in New Jersey is thus a judge-made rule.[12]

The *Roman* court reasoned that a jury would be "better able to fulfill its fact-finding function" if informed of the legal effect of its findings. *Id.* at 346, 413 A.2d 322. The court did not elaborate on its rationale, but instead, relied primarily on *Seppi v. Betty,* 99 Idaho 186, 579 P.2d 683 (1978), in which the Idaho Supreme Court discussed the then emerging trend toward allowing the trial judge to instruct the jury on the effect of its allocation of fault. *See id.* at 686–92.

Two observations about *Seppi* must be noted. First, the Idaho Supreme Court held that it was not reversible error to inform the jury of the ultimate outcome of the apportionment of comparative fault. *Id.* at 692. In contrast to *Seppi,* and without further discussion, the New Jersey Supreme Court fashioned an affirmative rule that the jury should be so informed, except in complex

cases "involving multiple issues and numerous parties ... if it would tend to mislead or confuse the jury." *Roman,* at 346–47, 413 A.2d 322. Second, the court in *Seppi* based its conclusion, at least in part, on the concern that a fifty-fifty division of fault would be "singularly attractive to a jury," and that such a division would bar the plaintiff's recovery in Idaho. *Seppi,* 579 P.2d at 690.

In New Jersey, a plaintiff will recover as long as his or her comparative fault is "not greater than" the combined fault of the defendants. N.J. Stat. Ann. § 2A:15–5.1 (West 1987). Indeed, the *Seppi* court noted that "Wisconsin, though not changing its rules to permit informing the jury of the legal effect of their answers, did adopt a 'no greater than' comparative negligence statute," and that such a statute "gives the plaintiff the benefit of the attractive 50–50 apportionment of negligence." *Seppi,* 579 P.2d at 691. *See also Roman,* 82 N.J. at 355–56, 413 A.2d 322 (Clifford, J., dissenting) (noting that New Jersey's Comparative Negligence Act was patterned on Wisconsin's act, and arguing that it should, therefore, be interpreted in accordance with the constructions placed upon it by Wisconsin courts, absent any contrary direction from the New Jersey Legislature).

The rationale for the "blindfold rule" was succinctly stated by the Wisconsin Supreme Court.

> Under our system of jurisprudence, the jury is the finder of fact and it has no function in determining how the law should be applied to the facts found. It is not the function of a jury in a case between private parties on the determination of comparative negligence to be influenced by sympathy for either party, nor should it attempt to manipulate the apportionment of negligence to achieve a result that may seem socially desirable to a single juror or to a group of jurors.

*McGowan v. Story,* 70 Wis.2d 189, 234 N.W.2d 325, 329 (1975).

---

12. As such, it is a response to the judge-made rule against informing the jury of the effect of its conclusions. This rule, also called the "blindfold" rule, probably was first announced by the Wisconsin Supreme court in 1890. *Ryan v.*

*Rockford Ins. Co.,* 77 Wis. 611, 46 N.W. 885 (1890). See Stuart F. Schaffer, Comment, *Informing the Jury of the Legal effect of Special Verdict Answers in Comparative Negligence Actions,* 1981 Duke L.J. 824, 830 (1981).

Where the giving or withholding of an instruction on the legal effect of the jury's comparative negligence findings is discretionary, one court approved such an instruction following "an inquiry from the jury that strongly implied confusion and speculation." *Schabe v. Hampton Bays Union Free School Dist.*, 103 A.D.2d 418, 480 N.Y.S.2d 328, 337 (N.Y.App.Div.1984). However, it seems equally probable that an "ultimate outcome" instruction following such an inquiry could have a pernicious effect. This was amply illustrated in *Riley v. K Mart Corp.*, 864 F.2d 1049 (3d Cir.1988). In *Riley*, an "ultimate outcome" instruction was given along with the initial charge. However, in answering a communication from the jury, the district court failed to repeat the "ultimate outcome" instruction. The jury returned a verdict assigning thirty (30) percent of the comparative fault to the defendant and seventy (70) percent to the plaintiff, and set the plaintiff's damages at $ 250,000.00. *Riley*, 864 F.2d at 1051. Presumably, based upon its "ultimate outcome" instruction, which was intended to inform the jury that no damages were to be awarded if the plaintiff's negligence exceeded fifty (50) percent, the district court faced what it considered an inconsistent verdict. *Id.* at 1052. Accordingly, the district court again explained the effect of the comparative negligence findings and the jury returned to deliberations. *Id.* The jury revised the special verdict to reflect 49.9% negligence on the plaintiff's part and 50.1% on K Mart's part, and damages in the amount of $ 150,000.00. *Id.* The district court entered judgment in favor of the plaintiff for $ 75,150.00. *Id.*

The Third Circuit vacated and remanded, pointedly noting that "[a]fter being reminded of Pennsylvania's rule on comparative negligence, the jury revised its still warm factual findings to reach the damage award it desired. In a matter of minutes, the plaintiff's damages dropped by $ 100,000.00 and the defendant's negligence increased by 20%." *Id.* at 1054. The Third Circuit further opined that, in view of the jury's original apportionment of negligence, the judgment for the plaintiff "seems to fly in the face of the Commonwealth of Pennsylvania's clearly expressed policy of denying recovery to a plaintiff whose negligence exceeds that of the defendant. To uphold the judgment entered below would be to sanction a verdict disrespectful of the applicable substantive law." *Id.* at 1055.

■ Moreover, it is not clear that the omission of an "ultimate outcome" charge in this case, even if it was error, adversely affected any substantial right of the plaintiff. New Jersey recognizes that the omission of the "ultimate outcome" charge can sometimes be harmless error.

In *Vartenissian v. Food Haulers, Inc.*, 193 N.J.Super. 603, 475 A.2d 626 (App.Div.1984), the Appellate Division of the New Jersey Superior Court found "substantial deficiencies" in the trial court's charge to the jury. *Id.* at 609, 475 A.2d 626. Among these was the omission of an "ultimate outcome" charge. *Id.* at 610, 475 A.2d 626. The appellate court noted that plaintiff's counsel failed to object to the omission of the charge. *Id.* However, the *Vartenissian* court did not rest its decision on counsel's failure to object. Instead, the court held that, by resolving the case through its assignment of eighty (80) percent of the negligence to the plaintiff and only twenty (20) percent to the defendant truck driver, "the jury could not have found that [the defendant truck driver] was more negligent than the plaintiff." *Id.* Accordingly, the *Vartenissian* court ruled that the omission of the "ultimate outcome" charge was harmless error. *Id.*

The reasoning of *Vartenissian* is compelling. In Hulmes's case, the jury assigned sixty-six (66) percent of the causative fault to the plaintiff and only thirty-four (34) percent to the defendants. This result is not suggestive of a jury entranced by the "singularly attractive" alternative of a roughly fifty-fifty split. Nor was there any communication from the jury hinting that the jurors were hampered in any way in their deliberations by the absence of an "ultimate outcome" instruction. In view of the jury's assignment of roughly twice as much causal fault to Hulmes, it is difficult to believe that any substantial right of the plaintiff's has been infringed. Given the jury's allocation of sixty-six (66) percent comparative fault to Hulmes, I conclude that the omission of the

"ultimate outcome" charge in this case, even if error, was harmless error.

■ Moreover, the New Jersey Supreme Court's holding in *Roman* that an "ultimate outcome" instruction should be given in a comparative negligence case was not absolute. As the court noted: "[I]n a complex case involving multiple issues and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury." *Roman*, 82 N.J. at 346–47, 413 A.2d 322.

■ This product liability case required the jury to consider two sophisticated and doctrinally distinct theories of liability and to weigh considerable expert testimony on difficult issues such as dynamic stability. New Jersey's Product Liability law, which employs presumptions and multiple part tests of risk versus utility, is highly nuanced. Indeed, there is no reported New Jersey case which has considered whether an "ultimate outcome" charge should be given in a product liability case.[13] Given the complexity of the task the jury was asked to undertake, in my view, to have given the "ultimate outcome" charge in this case would have misled or confused the jury.

Defendants maintain that *Roman v. Mitchell* is not controlling in this case in any event because this court's instruction to the jury upon submission of special interrogatories is a matter of federal procedure, rather than state substantive law. *See* Fed.R.Civ.P. 49(a). *See also Thedorf v. Lipsey*, 237 F.2d 190, 193 (7th Cir.1956). Plaintiff, without citation to caselaw or other authority, characterizes this contention as "ludicrous." Reply Brief at 8.

Plaintiff has pointed to no published case from any Circuit Court of Appeals reversing a district court for failure to give an "ultimate outcome" instruction in even the simplest of comparative negligence cases. Nor has this court's research revealed such a case. On the other hand, there are federal appellate cases standing for the proposition that the scope and content of a district court's special verdict is controlled by Fed. R.Civ.P. 49(a) and not by state law.

In *Lowery v. Clouse*, 348 F.2d 252 (8th Cir.1965), a diversity action, then-Circuit Judge Blackmun confronted the mirror image of the argument which plaintiff presses on this motion. At the time, Minnesota courts held that, when a special verdict was used, it was reversible error if the jury was "advised, expressly or by implication, of the result of its findings." *Id.* at 260 (citations omitted) It was argued that the district court's charge "impliedly" informed the jury of the legal effect of its answers. *Id.* at 259. The Eighth Circuit nevertheless affirmed, holding that the phrasing of the special verdict in a federal district court "is a matter of procedure governed by the federal rules and not by state practice." *Id.* at 260. This holding was subsequently reaffirmed by a different panel of that court. *See Davis v. Oberholtzer*, 588 F.2d 243, 246 (8th Cir.1978).

The conclusion that giving or withholding an "ultimate outcome" charge is procedural finds further support in those states which have accomplished uniformity on this issue through amendments to their Rules of Civil Procedure. *See, e.g.,* Texas R. Civ. P. 277 ("The court shall also instruct the jury to answer the damage question or questions without any reduction because of the percentage of negligence or causation, if any, of the person injured."); Minn. R. Civ. P. 49.01(b) ("[T]he court shall inform the jury of the effect of its answers to the comparative fault question . . ., unless the court is of the opinion that doubtful or unresolved questions of law or complex issues of law or fact are involved which may render such instruction or comment erroneous, misleading, or confusing to the jury.").

Because the omission of an "ultimate outcome" charge in this case, if it was error, was harmless error, and, as noted, even under New Jersey law, it was within the court's

---

**13.** The New Jersey Model Jury Charges suggest that an "ultimate outcome" charge may be given in a product liability case if the language of the charge is tailored to the circumstances. Model Jury Charges—Civil § 8.21(A) n. 1. The only case cited in the Model Jury Charges, however, is not a product liability case. *See Williams v. Town of Phillipsburg*, 171 N.J.Super. 278, 408 A.2d 827 (App.Div.1979).

discretion to refuse to give such a charge, plaintiff's motion for a new trial on this basis will be denied. Accordingly, it is unnecessary to determine whether the decision to give or withhold an "ultimate outcome" charge upon the submission of special verdicts is governed by federal procedural law or state substantive law in a diversity action in this court.

### 8. Comparative Risk Analysis

■ Plaintiff argues that this court erred in admitting testimony based upon comparative risk analysis. In deciding plaintiff's motions *in limine,* this court ruled that, as a general matter, the comparative risk of ATV riding, snow mobiling or bungee jumping was irrelevant in a product liability case. As was pointed out then, "[t]here is some degree of risk of an unhappy outcome associated with almost every human endeavor." Tr. of July 1, 1996 at 7. However, it was then understood that testimony concerning comparative risk analysis might be admissible to rebut certain documentary evidence relating to the Consumer Products Safety Commission's investigation into ATVs, were such evidence admitted. *Id.* at 8–9.

Prior to trial, plaintiff again sought to admit evidence drawn from the Consumer Products Safety Commission's ATV investigation. Some of this material was admitted, thereby opening the door to rebuttal evidence in the form of comparative risk analysis. The danger that the jury would accord undue authority to an investigation conducted by an official arm of the government required the admission of some evidence which would tend to rebut the CPSC data. It was for this purpose alone that the comparative risk analysis testimony was admitted. Plaintiff was aware that the court would allow this evidence for that purpose. At the charging conference, plaintiff failed to request a limiting instruction confining the jury's consideration of this evidence to its value in rebutting the CPSC material. In view of all these factors, plaintiff's motion for a new trial on this basis must be denied.

### 9. The "Super Trike" Brochure

■ Plaintiff maintains that this court erred in excluding from evidence an advertising brochure prepared by Honda for a small segment of Japanese consumers. Plaintiff characterizes this document as an admission by a party opponent going to the issue of design defect. It is nothing of the kind. This document contains nothing which could be termed an admission of "defect."

As to plaintiff's claims that the "Super Trike" brochure was crucial evidence on his failure to warn theory, plaintiff presented no evidence that the brochure was ever intended as a warning of any kind. Apparently, the brochure was advertising material which was *sold* in Japan to a limited number of off-road motorcycle enthusiasts. Therefore, plaintiff's characterization of this brochure as a "warning" that was delivered to the Japanese consumer, but withheld from the American consumer is unsupported by the record and highlights the potential for prejudice arising from this brochure had it been admitted into evidence. *See* Tr. of Oct. 3, 1996, part B, at 79. Moreover, I am again constrained to observe that, as to plaintiff's failure to warn theory, the exclusion of this document could not have prejudiced the plaintiff, since the jury found in his favor.

### 10. The Honda Advertising "Outtakes"

■ Masayuki Tanaka testified as an expert on behalf of Honda concerning the testing of ATVs. As part of his testimony, Mr. Tanaka showed videos of ATVs performing under test conditions. Plaintiff contends that, in cross-examining Mr. Tanaka, he should have been allowed to play "outtakes" from a Honda promotional video which showed ATVs flipping over. The court concluded that plaintiff had laid no foundation for screening the "outtakes" in rebuttal, because there was no evidence that the test conditions about which Mr. Tanaka testified were in way similar to the conditions under which the promotional video was filmed. Tr. of Oct. 17, 1996 at 18–19. It remains entirely unclear how Mr. Tanaka could usefully have commented on these "outtakes" without some knowledge of the conditions under which the filming took place. Accordingly, plaintiff's motion for a new trial on this ground will be denied.

### 11. Evidence of Modifications

■ Plaintiff asserts that a new trial is warranted because the evidence of modifications which he made to his ATV created the impression in the minds of the jurors that Hulmes's Honda ATC25OR was, at the time of the accident, "no longer the same product" which he purchased. Plaintiff's Brief at 49. This topic was exhaustively discussed during argument on pre-trial issues. Tr. of Sept. 25, 1996 at 204–09. Honda stipulated that it would not seek to show substantial modification or misuse of the ATV. *Id.* Honda offered the evidence in question solely to show that Hulmes was an experienced ATV enthusiast. There is no reason to believe that the jury used this information for any other purpose. Hulmes's experience, *vel non*, goes to his knowledge of the danger presented by the vehicle and the likelihood that he would have heeded additional warnings. The jury found in Hulmes's favor on the failure to warn issue. Accordingly, this evidence could not have prejudiced Hulmes's substantial rights and his motion based on this ground must be denied.

### 12. The Aftermath of the Accident

■ Plaintiff claims that this court erred in admitting testimony that Nick Hulmes, plaintiff's brother, pulled him from underneath the pickup truck where he came to rest after that accident. Plaintiff argued that the evidence allowed the jury to conclude incorrectly that some or all of plaintiff's injuries resulted from the conduct of Nicholas Hulmes. There is no merit to this argument.

Honda stipulated that the evidence of Nicholas Hulmes's post-accident conduct was not being offered to show that Nicholas Hulmes exacerbated the injuries suffered by the plaintiff. Tr. of Sept. 25, 1996 at 132. Honda offered the evidence to establish that Nicholas Hulmes had removed a beer bottle from his brother's waistband before the paramedics arrived on the scene. The court allowed this testimony as relevant to the issue of alcohol consumption. This issue has been addressed above and need not be reconsidered now. Plaintiff's motion based on the post-accident conduct of Nicholas Hulmes will be denied.

### 13. Dr. Mercaldi's Testimony

■ David W. Mercaldi, Honda's engineering expert, offered an opinion of the speed of Hulmes's ATV at the time of the accident based upon certain tests he performed. Tr. of Oct. 21, 1996 at 50. Plaintiff contends that these tests were unreliable and that Mercaldi's evidence inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These tests were extensively described by Dr. Mercaldi, out of the presence of the jury. Tr. of Oct. 21, 1996 at 46–105. At this Rule 104 hearing, Honda successfully demonstrated by a preponderance of the evidence that Dr. Mercaldi's test methodologies were reliable. The burden of proving by a preponderance that expert testimony is reliable is not meant to be an onerous one. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 743–45 (3d Cir.1994). Indeed, Honda filed an *in limine* motion seeking to bar the testimony of plaintiff's engineering expert, also based upon an appeal to *Daubert,* which was denied. Tr. of July 1, 1996 at 159. In denying Honda's motion this court adopted the view that whether the alternative designs suggested by plaintiff's expert were feasible, or whether the testing methods employed were state-of-the art, were not proper issues for a threshold determination under *Daubert. See In re Paoli,* 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."). Rather, *Daubert* requires the district court to determine whether novel or untested methodologies are sufficiently reliable that conclusions based upon them can be of some use to the jury. *Id.*

■ In this spirit, the court admitted the testimony of plaintiff's expert, Dr. Huston, and the jury heard his opinions regarding what he considered to be flaws in the designs of various Honda ATVs. On cross-examination, Honda vigorously attacked the sufficiency of the testing upon which Dr. Huston based his opinions. In its case, Honda put on Dr. Mercaldi, in part, to refute Dr. Huston's conclusions regarding Honda ATV designs. The court applied the same rationale

in admitting Dr. Mercaldi's testimony that it applied in admitting Dr. Huston's testimony. There was no error in so doing.

■ Plaintiff also objects to the timing of the disclosure of photographs and videotapes of Dr. Mercaldi's testing procedures. When this objection was raised at the Rule 104 hearing, the court limited his testimony and video presentation to tests of which plaintiff's counsel received timely submissions in still picture or video format. Tr. of Oct. 21, 1996 at 105–13.

The tests which Dr. Mercaldi performed were intended to rebut assertions made by plaintiff's engineering expert, Dr. Jeffrey Huston, at his deposition. The still photographs of these tests were presented to plaintiff's counsel at Dr. Mercaldi's deposition on August 12, 1996, only a few weeks after the tests were completed. It is difficult to imagine how plaintiff was prejudiced by this production, even if it was not as timely as humanly possible. This is especially so in that Dr. Mercaldi was not allowed to testify about, or describe any tests which were not presented in some form to plaintiff's counsel at his deposition. Plaintiff's assertion of surprise, therefore, is unfounded.

### 14. Testimony of Glynn and Tanaka

Plaintiff objects to the admission of the testimony of Edward F. Glynn, Assistant to the Executive Vice–President of American Honda Motor Company, Inc., and Masayuki Tanaka, an expert for Honda who supervised product testing of ATVs. It is difficult to determine the basis for this objection. Plaintiff appears to argue that this testimony was more prejudicial than probative. However, plaintiff fails to cite particular testimony and describe how it prejudiced his case. Instead, plaintiff paints with a broad brush, faulting the court for allowing the witnesses "to present lengthy multimedia presentations to the jury as if the trial were a shareholders' meeting." Plaintiff's Brief at 55.

■ To place this argument in perspective, plaintiff called Mr. Glynn during his case-in-chief to testify regarding the CPSC's ATV investigation and specifically Honda's efforts to disseminate a safety letter as part of its consent decree with the CPSC. Tr. of Oct. 7, 1996 at 33–107. Honda recalled Mr. Glynn during its case to develop further Honda's response to the CPSC investigation and its product warning procedures. Honda was under an ongoing duty, even after the ATV in question left its control, to take reasonable steps to warn the user of any newly discovered defects. The question of the reasonableness of Honda's actions in light of the CPSC investigation was for the jury to decide. Mr. Glynn's testimony addressed this issue.

■ Similarly, Mr. Tanaka's testimony concerning Honda ATV design and product testing was relevant to rebut testimony from plaintiff's expert regarding purported "design flaws." Mr. Tanaka was identified as an expert in ATV design who could testify to the design choices made by Honda. This was appropriate in view of the testimony of Dr. Huston, who made a broad attack on three-wheeled ATVs, preferring a four-wheeled design including a roll cage. Accordingly, there was no error in admitting this testimony.

In connection with this argument, plaintiff maintains that Tanaka should not have been permitted to "illustrate" his testimony relating to Honda's testing procedures with laser videos. Plaintiff maintains that these videos were irrelevant to any issue in the case. As noted above, Mr. Tanaka was called, in part, to rebut testimony from plaintiff's design expert, Dr. Huston, and the use of videos in support of Mr. Tanaka's testimony was entirely permissible. Accordingly, no substantial right of the plaintiff's was infringed.

### 15. Weight of the Evidence and Fundamental Fairness

Finally, plaintiff argues that the jury's verdict was against the weight of the evidence and that the trial was fundamentally unfair. These arguments merely summarize the issues plaintiff has presented in these motions. As set forth above, plaintiff fails to meet the standard which would allow this court to set aside the jury's verdict. Plaintiff's argument that the trial lacked fundamental fairness is entirely unpersuasive. Accordingly, plaintiff's motion for a new trial based on the

weight of the evidence and fundamental fairness will be denied.

### III. Conclusion

For all the reasons set forth above, plaintiff's motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e), and his alternative motion for a new trial pursuant to Fed.R.Civ.P. 59(a), will be denied. The court will enter an appropriate order.

### ORDER

This matter having come before the Court on March 7, 1997, on the Motion of Plaintiff, Robert T. Hulmes, to Alter or Amend the Judgment entered in this case on October 31, 1996, and Plaintiff's alternative Motion for a New Trial, and Plaintiff, Sherry Hertlein having joined the motion.

The Court having considered the briefs, the trial transcripts and trial exhibits, for the reasons set forth in this Court's OPINION, filed concurrently with this ORDER,

It is on this 11th day of March, 1997, ORDERED that the Motion of Plaintiff, Robert T. Hulmes, to Alter or Amend the Judgment entered in this case on October 31, 1996, pursuant to Fed.R.Civ.P. 59(e), and Plaintiff's alternative motion for a new trial pursuant to Fed.R.Civ.P. 59(a), are **DENIED.**